UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff/Respondent, | ) | Criminal Action No. 2: 11-021-DCR |
| | ) | and |
| V. | ) | Civil Action No. 2: 12-7215-DCR |
| | ) | |
| ALYSIA R. ELLIOTT, | ) | |
| | ) | **MEMORANDUM OPINION** |
| Defendant/Movant. | ) | **AND ORDER** |
| | ) | |

*** *** *** ***

This matter is pending for consideration of Defendant/Movant Alysia R. Elliott's motion to vacate, set aside, or correct her sentence pursuant to 28 U.S.C. § 2255. [Record No. 267] The motion will be denied for several reasons. First, Elliott waived the right to challenge her sentence. This waiver was not the result of ineffective assistance of counsel. Additionally, even if Elliott had not waived the right to file a habeas motion, her substantive claims would fail because they are without merit. As explained more fully below, Elliott's guideline range was correctly calculated. Her plea agreement was not binding on the Court and the sentence imposed was entirely reasonable and proper in light of the defendant's criminal conduct.

**I.**

**A.     The Defendant's Admitted Conduct, the Indictment and Plea Agreement**

Elliott and her cohorts devised and participated in a scheme to steal money and property from a number of businesses located in several states. On March 10, 2011, Elliott and nine other

-1-

defendants were indicted for various acts of wire fraud resulting from the scheme. [Record No. 1] Elliott was named in Count 1 and Counts 3 through 21 of the Indictment.[1]

The scheme, and the defendant's participation in the scheme, are described in detail in Elliott's Plea Agreement.

> The defendants conspired to intentionally commit this wire fraud from February 2008, through December 2010. They committed it in multiple states to avoid detection including Boone, Campbell, Jefferson and Fayette Counties, Kentucky, Ohio, Virginia, New Jersey, Indiana, Michigan, Illinois, South Carolina, Tennessee, Georgia, Florida, Pennsylvania, West Virginia, Iowa, and Wisconsin.

> Members of the conspiracy stole bank checks, and/or voluntarily obtained the personal bank checks of co-conspirators and/or used their own personal checks, and negotiated them as traveler's checks at various retailers, to include Target, Walmart, Kohl's and Meijer stores. The defendants knew that the checks were backed by insufficient funds and concealed this fact. Typically while working together, during each transaction, the defendant responsible for passing the check would request the clerk to process the check as a traveler's check. When the clerk did this, no identification was required and the system would bypass the usual security processing of the check, effectively processing it as if it was cash. Each time the clerk would key in the transaction to be processed as a traveler's check, a wire transmission would be caused to occur between the point of sale and the businesses' servers out of state. The fraud was complete at that point, however, the United States could also prove in a number of instances that members of the conspiracy would return the items they had "purchased" at other store branches for cash. Certain members of the conspiracy took a leadership or management role and recruited and/or trained other members to obtain insufficient funds checks and/or pass them as traveler's checks. The total loss was approximately $218,816.68.

> This defendant admits that she began to participate in this conspiracy on or about 2010. She participated with both conspiratorial leaders, Victoria Conlon and John Elliott, and assisted in recruiting and training others, including Mary Wilder and Megan Stone. She passed, or aided and abetted in the passing of, a large majority of the checks, including, but not limited to her own checks, to retailers in

---

1   Counts 3-21 relate to acts of wire fraud committed by Elliott and/or her co-conspirators in Campbell County, Kentucky (Counts 3-5, and 11-21) and Boone County, Kentucky (Counts 6-10) during the period June 30, 2009, through October 1, 2010.

numerous states with John Elliott and Victoria Conlon. She went to the other states to commit the fraud for the purpose of evading detection of the scheme. She admits that she opened fraudulent checking accounts with the intent of using those checks in the conspiracy. She further stole and fraudulently used the checks of M.M. in the execution of this conspiracy. Finally, the defendant admits that the United States could prove each overt act set forth in Count 1 of the Indictment. She further admits that she participated in overt act numbers 2-20.

[Record No. 182; A. Elliott Plea Agreement] Twenty-three overt acts identified in Count 1. Overt acts 2 through 20 relate to the negotiation of traveler's checks at various stores located in Boone County, Kentucky during the period June 30, 2009, through October 1, 2010.[2] [Record No. 1]

In paragraph 5 of her Plea Agreement, Elliott and the United States made certain non-binding, sentencing guideline recommendations relating to the conduct and loss which was reasonably foreseeable to the defendant. These recommendations are relevant to Elliott's present claims.

> 5. Pursuant to Rule 11(c)(1)(B), the United States and the Defendant recommend the following sentencing guidelines calculations, and they may object to or argue in favor of other calculations. This recommendation does not bind the Court.
>
> > (a) United States Sentencing Guidelines (U.S.S.G.), November 1, 2010, manual, will determine the Defendant's guideline range.
> >
> > (b) Pursuant to U.S.S.G. § 2B1.1, the base offense level is 7.
> >
> > (c) Pursuant to U.S.S.G. § 1B1.3, the Defendant's relevant conduct which was reasonably foreseeable to her includes $160,998.43.
> >
> > (d) Pursuant to U.S.S.G. § 2B1.1(b)(1), increase the offense level by 10 levels for the amount of loss.

---

2       The overt acts numbered two through five occurred during 2009 with the earliest acts (acts two and three) committed on June 30, 2009. Other than Elliott, no other defendant is identified as directly participating in the criminal acts committed on June 30, 2009.

(e) Pursuant to U.S.S.G. § 2B1.1(b)(2)(A), increase the offense level by 2 levels because the offense involved 10 or more victims.

(f) Pursuant to U.S.S.G. § 2B1.1(b)(9)(A), increase the offense level 2 levels because the defendant relocated, or participated in relocating, the fraudulent scheme to another jurisdiction to evade law enforcement.

(g) Pursuant to U.S.S.G. § 3E1.1, and unless the Defendant commits another crime, obstructs justice, or violates a court order, decrease the offense level by 2 levels for the Defendant's acceptance of responsibility. If the offense level determined prior to this 2-level decrease is level 16 or greater, the United States will move at sentencing to decrease the offense level by 1 additional level based on the Defendant's timely notice of intent to plead guilty and her full admission of relevant conduct.

(h) Pursuant to U.S.S.G. § 5E1.1, and Title 18 U.S.C. Section 3663 (a)(3), the parties agree that restitution is $160,998.43, . . .

[Record No. 182] This paragraph of Elliott's Plea Agreement also identifies ten specific victims of the defendant's conduct and lists the loss that each incurred. The total amount of loss attributed to Elliott equals the amount of restitution for which the defendant acknowledged responsibility.

Elliott specifically agreed that she would not seek a sentence below her applicable advisory guideline range under the United States Sentencing Guidelines. Further, in paragraph 8 of her Plea Agreement, Elliott specifically agreed to waive "the right to appeal and the right to attack collaterally [her] guilty plea, conviction, and sentence, including any order of restitution." [*Id.*, at p. 6]

### B.   The Defendant's Admissions and Representations During the Re-Arraignment Hearing

Elliott and Defendant Mary Wilder were re-arraigned for the purpose of entering guilty pleas on May 16, 2011. After explaining the process to be followed during the hearing and

-4-

confirming that Elliott was competent to enter a guilty plea, counsel for the government and the Court thoroughly reviewed the contents of each defendant's written Plea Agreement. [Record No. 277, pp. 14-25] Elliott confirmed that: (i) she had reviewed her Plea Agreement and discussed its terms and contents with her attorney before signing the document; (ii) she fully understood the terms of the Plea Agreement; (iii) there were no undisclosed side agreements, promises or threats made to induce her guilty plea; (iv) counsel for the United States had accurately summarized the relevant provisions of the Plea Agreement; (v) the amount of loss reasonably foreseeable to her totaled $160,998.43; (vi) neither her attorney nor the Court could determine the actual guideline range applicable to her case at the time of her guilty plea; and (vii) she understood the full extent of the waiver provisions contained in her Plea Agreement. Further, Elliott specifically acknowledged that her waiver included the right to collaterally attack her guilty plea, conviction and sentence. [*Id.*, pp. 14-16, 19-20, 23, 25]

After outlining the charge contained in Count 1 of the Indictment, the Court asked Elliott to explain, in her own words, why she was guilty of the charge. She replied in the following manner:

> DEFENDANT ELLIOTT: Last summer, M.M.'s checks got sent to my house on accident and I took the checks and I went to the stores and told the cashiers to ring them up as traveler's checks up to $400, that's as much as you can do a traveler's check, and then I would take the stuff back to get the cash for it.
>
> THE COURT: And did you have an agreement with these other individuals that are listed?
>
> DEFENDANT ELLIOTT: I was with Victoria when I did it.
>
> THE COURT: All right. Did she give you instructions on how to –

DEFENDANT ELLIOTT: I seen her, how to do it, so I started doing it.

THE COURT: And did one or more of your actions take place in Boone or Campbell County, which is in the Eastern District of Kentucky?

DEFENDANT ELLIOTT: Yeah.

THE COURT: And did one or more of your actions take place during the time as charged in the indictment in Count One, which would be during the period of February 2008 through December of 2010?

DEFENDANT ELLIOTT: Yeah.

THE COURT: Your plea agreement also has a factual statement. I know that you've had an opportunity to review the factual statement with your attorney, paragraph three. Is the information that's contained in paragraph three true and correct to the best of your knowledge and belief?

DEFENDANT ELLIOTT: Yes.

[*Id.*, pp. 32-33] While Elliott did not orally acknowledge during the May 16, 2011 hearing that her involvement in the conspiracy commenced as early as June 30, 2009, she made this admission by agreeing that she committed overt acts two through twenty of Count 1 of the Indictment.

The Court then proceeded to review the elements that the United States would be required to prove to obtain a conviction under Count 1 if the matter proceeded to trial. Elliott acknowledged that the United States would be able to prove the elements of the offense with respect to her conduct. [*Id.*, p. 35] She then confirmed that she intended to enter a guilty plea to Count 1 because she was, in fact, guilty of the charge and that she had fully understood all of the Court's questions. [*Id.*, p. 35, 41]

### C.     The Defendant's Presentence Investigation Report

Elliott's Presentence Investigation Report ("PSR") was disclosed on August 10, 2011, by the probation officer responsible for preparing the report.  While the defendant did not file any substantive objections to the PSR, she did request that two minor modifications be made to paragraphs 67 and 69 relating to the age of Katrina Jeffries and the correct spelling of her daughter's name.  [PSR, p. 22]  Thus, it is clear that Elliott had reviewed her PSR well in advance of the sentencing hearing.

With one exception, the PSR contained the suggested guideline calculations recommended by the parties in the defendant's written Plea Agreement.  However, in paragraph 36, the probation officer recommended a three level increase to the Base Offense Level based on Elliott's leadership role in the offense.  The factual support for this increase is outlined in paragraphs 15 through 26 of the PSR.  The PSR also identified the actual loss to the victims as a result of the defendants' actions.  While this amount was calculated as totaling $218,816.68.  The amount used to calculate the increase in *Elliott's* Base Offense Level under United States Sentencing Guideline § 2B1.1(b)(1)(F) was limited to the amount of loss attributed to *Elliott* ($160,998.43) and identified in her Plea Agreement.  [PSR, p. 10, ¶ 32]  Based on a Total Offense Level of 21 and a Criminal History Category III, Elliott's range of imprisonment under the United States Sentencing Guidelines was calculated as 46 to 57 months. [PSR, p. 19, ¶ 85]

### D.     The Sentencing Hearing

Elliott's sentencing hearing was held on September 14, 2011.  [Record No. 274]  At the beginning of the hearing, the Court confirmed that the defendant had received a copy of her PSR

and that she had reviewed the report and discussed its contents with her counsel.  [*Id.*, p. 2] Although a written objection had not been filed to the PSR, Elliott's attorney was allowed to argue that the three-level role adjustment should not be applied in calculating the defendant's guideline range.  [*Id.*, p. 3-9]  According to her counsel, Elliott became involved in the conspiracy late in the fall of 2010[3] after the scheme had been "devised, hatched, [and] executed over and over and over again by others before she was ever involved."  [*Id.*, p. 8]  Additionally, during her involvement, Elliott claimed to be she was unable to recall events due to her "raging heroin addict[ion]".  [*Id.*]

In response to these arguments, the United States presented the testimony of Agent Kevin Dye to explain Elliott's role in the conspiracy based on the evidence he had obtained in the case. [Id., pp. 9-22]  According to Agent Dye, the loss attributed to Elliott represents money that was stolen while working with co-Defendant Victoria Conlon, primarily in Kentucky.  Dye testified that, after obtaining checks of a victim in the case (*i.e.*, "M.M."), Elliott and Victoria Conlon passed checks in Kentucky, Ohio, Florida, Michigan and Indiana.  Further, Elliott's actions in passing these checks were contrary to the instructions given by co-Defendant John Elliott.  [*Id.*, p. 11-12]  According to Dye, during one trip to Florida in August or September 2010 to obtain narcotics, Elliott directed at least a portion of the defendants' activities after John Elliott (the defendant's uncle and leader of the conspiracy) was arrested.  More specifically, Elliott directed co-Defendant Megan Stone to keep the checks being negotiated under $400, directed her to

---

3       As noted by the Assistant United States Attorney during the sentencing hearing, Elliott began passing checks as part of the scheme on June 30, 2009. [Record No. 274, p. 28]

negotiate the checks as traveler's checks, and chose the stores at which the checks would be negotiated.  [*Id.*, pp. 15-19, 21]

After hearing arguments of counsel, the Court rejected the position advanced by Elliott's attorney that Defendants Elliott, Stone and Wilder were acting independently pursuant to a jointly-undertaken plan.  The Court further determined that the role adjustment had been properly applied by the probation officer.  In relevant part, the Court explained,

> You only have to supervise or manage or be responsible for one other person. There has to be five or more total involved, and there's no issue about that.  The number of defendants in this case, I believe, is ten.  If we just look at the defendants, we're over five.  That's one issue, of course.
>
> Whether it's otherwise extensive, if we look at the number of victims and if we look at the total dollars that are involved, in excess of $200,000 in the total conspiracy, you'd be hard pressed to argue it's not otherwise extensive.
>
> So really, the question becomes whether this defendant was an organizer or a leader of criminal activity involving at least one of those other people, or whether she was a manager or supervisor of at least one other person involved in the criminal activity.
>
> **         **         **
>
> I do understand your argument that she was, in your words, late to the party.  But most of the party occurred after she became involved or after she attended the party, because she's responsible for $160,000 out of a total of $218,000.  That's a little – I guess a little bit less than 75% of the total victim's loss occurred after she became involved, is attributed to her . . .
>
> **         **         **
>
> . . . are you ignoring the other testimony that she exercised independent decision making authority with respect to the original victims in the case by taking those checks [of M.M.] and using those checks, contrary to the instructions of the other leaders?

[*Id.*, p. 23-27]

Additionally, the Court engaged in the following exchange with the defendant's attorney regarding Elliott's exercise of independent decision-making regarding the checks belonging to M.M.

> MR. SMITH: I don't believe that she used the MM checks against someone's instructions.  I think she used them after the Florida trip.
>
> THE COURT: I'm sorry, but I thought I heard the agent testify that he [Defendant John Elliott] instructed her not to use those checks because he was concerned that that was part of a sting operation.
>
> MR. SMITH: I don't know that Vic – I've never heard that from my client that she was ever instructed not to use –
>
> THE COURT: I think that I just heard it from the witness stand, and there was no objection to the testimony.
>
> MR. SMITH: There was no objection to the testimony.
>
> THE COURT: If I'm making a mistake, I can go back and look at the transcript.
>
> MR. SMITH: No, no.  I remember hearing that.
>
> THE COURT: All right.
>
> MR. SMITH: And so she did exercise independence, but independence isn't necessarily control of other people or management.

[*Id.*, p. 27] Further, the checks stolen from M.M. were negotiated around the time of the Florida trip.  [*Id.*, pp. 12, 28]

The following oral findings and discussion are also relevant to the Court's decision to overrule the defendant's objections regarding the three point role adjustment assigned to Elliott.

> THE COURT: . . . With respect to the issue of a role adjustment, the question becomes whether the Court should draw the line at this defendant being an organizer or a leader of at least one other person involved in this conspiracy or whether she was more of a manager or supervisor. . . .  As I indicated to counsel

through my questions, this is, of course, a fact-intensive inquiry, as the application notes indicate and as case law from the Sixth Circuit would indicate. There are a number of factors for the Court to consider, . . . and those factors are set forth in the application notes, including Application Note 4.

The factors that the Court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, claimed right to a larger share of the fruits of the crime and the degree of participating in planning and organizing the offense, the nature and the scope of the illegal activity and the degree of control and authority exercised over others. And the application note further notes that there can be, of course, more than one person who qualifies as a leader or organizer of a criminal association or conspiracy.

The fact that Miss Stone may have known how to carry out the fraudulent conduct during the Florida trip is not dispositive of that issue. That would be similar to arguing that two bank robbers, one that's clearly exercising control over another, wouldn't be an organizer if the other person had robbed a bank previously and knew how to do it.

It's the actual fact of whether there was decision making authority that was exercised and whether the person was acting as an organizer or a leader or was just simply managing or supervising the activity.

This is a very close case. The Court considers facts such as that Miss Elliott acted contrary or inconsistent with instructions that were given to her in stealing Miss Monahan's [M.M.'s] checks and using those checks to further the goals of the conspiracy. That she was acting, again, inconsistently with what she had been instructed by Mr. Elliott, who could be seen as the overall leader of the organization.

However, when the Court then also looks at the other activities that the defendant displayed, it would appear to be that she was more of an ordinary participant until the trip to Florida takes place, at which time she became at least a manager or supervisor after Mr. Elliott was not present.

She did give specific instructions to Miss Stone about carrying out the fraud. And again, while Miss Stone may have understood the way Target processed traveler's checks at the time, it's clear that she directed Miss Stone to keep the checks under $400 and told her to negotiate as a traveler's check.

-11-

Inasmuch as the Court finds that there would be sufficient evidence in the case to reach either conclusion, the Court carefully considers all the testimony in the case and believes that when we look to the total involvement in the matter, Miss Elliott is, in fact, responsible for $160,000 of the total criminal conduct that results in victims' losses of $218,000.  That is significant.

When I also look at the specific conduct that would give rise to her managerial role, her leadership role, she would be more of a manager when the Court looks at that specific conduct, and so the Court will err on the side of the lesser role in the case and will apply the third level, three levels for aggravating role in this case.

[*Id.*, p. 31-33][4]

Following allocution, the Court determined that a term of incarceration of 57 months was necessary to meet all statutory factors outlined in 18 U.S.C. § 3553. The Court also recommended that the defendant: (i) obtain a mental health assessment and treatment; (ii) participate in the Bureau of Prison's drug treatment program; (iii) receive vocational training; and (iv) participate in the Bureau of Prison's parenting program during her period of incarceration.  Finally, Elliott was ordered to pay restitution[5] in the amount of $160,998.43 to the victims identified in her Plea Agreement and PSR.

---

4    After pointing out that additional testimony could have supported a four-level role adjustment, the Court made the following additional comment regarding the tardiness of the defendant's objection:

I will note for the record that while a formal objection was not made, a timely objection was not made, the Court has considered and allowed the defendant to make a late objection.  The United States has not objected to the Court proceeding in that manner but, of course, the Court also recognizes that had a timely objection been made, the United States may have been prepared to present additional evidence on this point.

[*Id.*, p. 34] Based on the foregoing, the defendant suffered no prejudice by her counsel's failure to file timely, written objections to the PSR regarding the role adjustment recommended by the probation officer.

5    This is a joint and several obligation of this defendant together with Defendants John Elliott and Victoria Conlon.

## II.

Elliott did not file a direct appeal of her guilty plea, conviction, or sentence.  However, on February 16, 2012, Elliott filed a motion to amend the judgment for the purpose of limiting restitution payments under the Inmate Financial Responsibility Program.  [Record No. 254]  Next, on March 15, 2012, Elliott wrote to the Court to complain about the Bureau of Prison's failure to enroll her in the 500 hour drug treatment program. [Record No. 265]  The Court addressed these complaints in prior Orders.  [Record Nos. 257, 264]

Elliott filed the present motion seeking to vacate, set aside, or correct her sentence on May 11, 2012. [Record No. 267]  In support of her claim for relief, Elliott makes three assertions.  First, she argues that "the intended loss [in her case] far exceeds the actual loss." As a result, the defendant argues that she received a higher sentence which resulted in a miscarriage of justice.  [*Id.*, p. 4]  Next, Elliott contends that her attorney provided ineffective assistance by failing to "pursue overlooked mistakes in computation of [the] offense level, as well as, mathematical errors relating to [her] relevant conduct."  [*Id.*]  In other words, Elliott does not assert that she is innocent of the conduct charged in the indictment; instead, she asserts that the guideline calculation contained in her PSR was incorrect and that her attorney was ineffective for failing to identify and correct the error.  Finally, the defendant contends that she received a harsher sentence than other individuals convicted for the same offense.  [*Id.*, p. 7]

Due to the lack of detail provided in support of Elliott's claims, the United States Magistrate Judge directed the defendant to file a supplemental pleading articulating the facts supporting each ground raised in her § 2255 motion.  [Record No. 268]  Elliott filed a timely

-13-

addendum to her motion on May 23, 2012. [Record No. 269] In relevant part, Elliott provided the following additional information regarding her claims.

Regarding her claim that the intended loss in the case far exceeded the actual loss, the defendant contends that a downward adjustment of her guideline range was warranted because "the actual loss was approximately 1/3 the amount of the intended loss and it overstated the severity of the loss." In other words, Elliott contends that she should only be held responsible for the checks of M.M. that she cashed (approximately $20,000), as opposed to the checks also cashed by other co-conspirators that were reasonably foreseeable to her.[6] Apparently referencing Application Note 19(C) to U.S.S.G. §2B1.1, Elliott argues that, in some cases, the offense level determined under this section of the guidelines overstates the seriousness of the offense.

Elliott also mistakenly argues that the Court varied upward from her guideline range in imposing a term of imprisonment of 57 months, and that it was a mistake to do so. In this regard, Elliott seems to amend her argument to include a claim that she was promised that she would only receive a sentence of 46 months' of incarceration in exchange for her guilty plea. Thus, she attempts to convert the non-binding written Plea Agreement into one that would be binding on the parties and the Court.

Regarding her second argument of ineffective assistance of counsel, Elliott asserts that her attorney failed to properly object to the role adjustment contained in her PSR until the date

---

6       Although referenced by the defendant, any discussion of intended loss is inapplicable. Elliott's base offense level was adjusted by the amount of actual loss attributed to her directly and as relevant conduct caused by others which was reasonably foreseeable to her. Ten levels were added to Elliott's Base Offense Level of 7 because the actual loss (defined as "the reasonably foreseeable pecuniary harm that resulted from the offense") exceeded $120,000 but was less than $200,000. *See* U.S.S.G. § 2B1.1(b)(1)(F) and Application Note 3.(A)(i) to that guideline section.

of sentencing. Further, she contends that he "neglected to provide forensic financial loss statements to support actual loss" and "did not allow adequate time for sentencing preparation and development of defense strategies." [*Id.*, p. 3-4] Elliott, however, has totally failed to provide any support for these cursory assertions. She has failed to provide any evidence that the loss attributable to her was incorrect and she has failed to explain how additional time for sentencing preparation or the development of defense strategies would have altered the outcome of the case or the sentence imposed.

Finally, to supplement her third argument, Elliott asserts that one of the other defendants "received a worse punishment than others equally guilty defendants in her case." Thus, she believes that the punishment in the case was unfair and disparate. Elliott does not identify the particular defendant, and makes no reference to that individual's relevant guideline range, relevant conduct, loss attributable to the unidentified defendant, or § 3553 factors.

## III.

To prevail on a § 2255 motion, a defendant must allege that: (1) her conviction resulted from an error of constitutional magnitude; (2) her sentence was imposed outside the statutory limits; or (3) an error of fact or law occurred that was so fundamental as to render the entire proceeding invalid. *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003). When alleging a non-constitutional error, a defendant must prove the alleged error constituted a "'fundamental defect which inherently results in a complete miscarriage of justice,' or an error so egregious that it amounts to a violation of due process.'" *United States v. Ferguson*, 918 F.2d 627, 630 (6th Cir. 1990) (quoting *Hill v. United States*, 368 U.S. 424, 428 (1968)). In making

-15-

a § 2255 motion, the movant bears the burden of proving his or her contentions by a preponderance of evidence. *McQueen v. United States*, 58 F.App'x 73, 76 (6th Cir. 2003) (per curiam) ("Defendants seeking to set aside their sentences pursuant to 28 U.S.C. § 2255 have the burden of sustaining their contentions by a preponderance of the evidence.").

Before addressing the substance of Elliott's claims, the Court must first consider the issue of waiver of her right to collaterally attack the guilty plea, conviction and sentence imposed in the case.[7]  That is because a defendant may knowingly and voluntarily waive his or her right to pursue collateral relief in a plea agreement.  If valid, the waiver extends to claims of ineffective assistance of counsel. *Davila v. United States*, 258 F.3d 448, 450-51 (6th Cir. 2001).  The waiver, however, would not extend to claims that the provision itself was the result of ineffective assistance of counsel.  In other words, if Elliott is able to demonstrate that she was mislead regarding the waiver provision or that her plea agreement was the result of ineffectiveness on the part of her attorney, her substantive challenges would not be barred.

In the present case, the Court has found that the defendant's guilty plea was knowing and voluntary and that she fully understood all terms and conditions of the written Plea Agreement, including the effect of the waiver of right to directly or collaterally attack the guilty plea, conviction, and sentence.  [Record No. 62]  The language of Elliott's Plea Agreement contains a clear and unambiguous waiver of the right to collaterally attack the defendant's guilty plea, conviction, and sentence imposed.  The sentence imposed was within the range authorized by

---

7       Waiver is the "intentional relinquishment or abandonment of a known right." *United States v. Olano*, 507 U.S. 725, 733 (1993) (internal quotation marks omitted).  Constitutional rights may be waived as long as the defendant does so knowingly and voluntarily. *United States v. Ashe*, 47 F.3d 770, 775-76 (6th Cir. 1995).

the relevant statutory provision for the offense of conviction.  The potential penalties were clearly explained to the defendant before her guilty plea was accepted.  Additionally, Elliott clearly understood that neither the Court nor her counsel could accurately predict the guideline range which would be applicable in her case until the presentence investigation report was completed and all objections resolved.  Further, Elliott agreed in writing that the parties' recommendations regarding guideline calculations would not be binding on the Court.  And she acknowledged that the written Plea Agreement contained all of the terms of the parties' agreement.  There were no undisclosed terms and Elliott stated under oath that her guilty plea was not the result of threats or force of any kind.

As a result, Elliott may not base a claim of ineffectiveness on an assertion that she would receive a specific sentence (*i.e.*, 46 months or some term less than the term actually imposed by the Court).  Instead, her claim of ineffectiveness is limited to assertions that she is not responsible for the relevant conduct of others and that it was error for her attorney to lead her to believe that her sentence should be calculated based on any amount beyond the value of the checks she personally negotiated.  However, this claim fails as a matter of law.  As outlined more fully below, Elliott's guidelines were not improperly calculated based on the evidence presented to the Court.

### A.      Claims of Ineffective Assistance of Counsel

When asserting a claim of ineffective assistance of counsel, a movant must prove both deficient performance and prejudice.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Pough v. United States*, 442 F.3d. 959, 964 (6th Cir. 2006) (a movant must prove ineffective

-17-

assistance of counsel by a preponderance of the evidence).  To prove deficient performance, a movant must show that her attorney made errors "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. A movant may meet this burden by establishing that his attorney's representation "fell below an objective standard of reasonableness" as measured under "prevailing professional norms" and evaluated "considering all the circumstances." *Id.* at 687-88.  Under this test, judicial scrutiny of the attorney's performance is "highly deferential," consisting of a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]" *Id.* at 689. "Deficient performance" is constitutionally prejudicial only when the attorney's errors were "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

To prove prejudice, a movant must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694.  It must also be noted that, when evaluating the issue of prejudice, courts generally take into consideration the "totality of the evidence" presented to the decision maker *Id.* at 695.  Where a claim of ineffective assistance follows a guilty plea, the movant must show that a "reasonable probability exists that, but for counsel's errors, [she] would not have pleaded guilty and wound have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985).

As previously noted, Elliott's assertions that her attorney promised that she would only receive a sentence of 46 months' of incarceration is contrary to his sworn statements made during the defendant's plea hearing.  The Supreme Court has recognized that a defendant's solemn declaration made during such a hearing carries a presumption of truthfulness. *Blackledge*

-18-

*v. Allison*, 431 U.S. 63, 74 (1977).  Thus, even if she had not waived the right to challenge her guilty plea, conviction and sentence, Elliott's substantive claim of ineffectiveness regarding the length of her sentence would fail.  As the United States Court of Appeals for the Fourth Circuit has explained,

> an appropriately conducted Rule 11 colloquy can only serve meaningfully if the court is entitled to rely on the defendant's statements made under oath to accept a guilty plea.  To view the Rule 11 plea colloquy as a procedural game in which pieces are moved and manipulated to achieve a result that can beat the system established for providing due process to the defendant undermines that very process.

*United States v. Bowman*, 348 F.3d 408, 417 (4th Cir. 2003) (internal citations omitted); *see also Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986) (observing, as to "fully adequate" Rule 11 procedures, that "[t]o allow defendant to attempt to prove by affidavit that the agreement is otherwise than it appears, unambiguously, on a thorough record would violate established contract-law standards").  In this case, Elliott represented to the Court during the re-arraignment hearing that she had not been told she would receive any particular sentence in exchange for her guilty plea.  She fully understood that the sentencing guideline range could not be correctly calculated at that time and that the final decision regarding the sentence to be imposed was outside the parties' control.

Next, even if Elliott's original attorney had incorrectly predicted (as opposed to falsely promised) the defendant's guideline range at the time she entered her guilty plea, the defendant would not be entitled to relief in this proceeding.  It is well-settled that "a defense attorney's erroneous calculations and prediction of the sentencing guidelines is not a basis for setting aside a guilty plea."  *United States v. Hicks*, 4 F.3d 1358, 1363 n.3 (6th Cir. 1993); *see United States*

-19-

*v. Stephens*, 906 F.2d 251, 253-54 (6th Cir. 1990); *see also Gonzalez v. United States*, 33 F.3d 1047, 1051-52 (9th Cir. 1994) ("The district court informed [the defendant] of the maximum possible sentences and fines for the offenses to which he pleaded guilty. He responded affirmatively when asked if he was satisfied with [counsel's] representation of him. As a result, [he] cannot claim he was prejudiced by [counsel's] alleged gross error in calculating the sentencing guidelines range and likely sentence."); *Doganiere v. United States*, 914 F.2d 165, 168 (9th Cir. 1990) ("[Defendant's] attorney's inaccurate prediction of what sentence [he] would receive upon pleading guilty does not rise to the level of a gross mischaracterization of the likely outcome of his case, and thus does not constitute ineffective assistance of counsel. Further [defendant] suffered no prejudice from his attorney's prediction because, prior to accepting his guilty plea, the court explained that the discretion as to what the sentence would be remained entirely with the court." (internal citation omitted)).

Elliott's remaining claim of ineffective assistance (*i.e.*, that her attorney misconstrued the loss attributable to her and negotiated a flawed plea agreement based on that misunderstanding) also fails because the defendant's guideline range was correctly calculated based on the relevant conduct attributable to her. Evidence was presented by the United States establishing that Elliott joined the conspiracy no later than June 30, 2009. On that date, she negotiated two checks as traveler's checks at a Wal-Mart store (#1961) located in Alexandria, Kentucky. Her actions on that date were in furtherance of the scheme. Elliott returned to the same store on July 21, 2009, and negotiated a check in the amount of $476.83. Approximately two and one-half months later, Elliott negotiated another NSF check as a traveler's check at a Target store located in Florence,

Kentucky.  After Elliott joined the conspiracy and took actions which furthered its goals and objectives, victims suffered losses of $160,998.43.

While the total loss exceeded $218,816.68, that amount was not attributed to her.  Under U.S.S.G. § 3B1.3[8], the loss occurring after Elliott joined the conspiracy is properly attributable to her in determining the role adjustment under § 2B1.1(b)(2)(A) because the actions of her co-conspirators were reasonably foreseeable to her by June 30, 2009.  As a matter of law, Elliott may not limit the loss amount under this section to the checks she actually negotiated.  To do so would require that the Court ignore relevant conduct which it may not do under the circumstances presented.  The application notes to § 3B1.3 contain the following example of relevant conduct which applies by analogy to the present case:

> (2)     Defendants F and G, working together, design and execute a scheme to sell fraudulent stocks by telephone.  Defendant F fraudulently obtains $20,000.  Defendant G fraudulently obtains $35,000.  Each is convicted of mail fraud.  Defendants F and G each are accountable for the entire amount ($55,000).  Each defendant is accountable for the amount obtained by his accomplice under subsection (a)(1)(B) because the conduct of each was in furtherance of the jointly undertaken criminal activity and was reasonably foreseeable in connection with that criminal activity.

*See* Application Note to United States Sentencing Guideline §3B1.3 ("Illustrations of Conduct for Which the Defendant is Accountable, (c)(2)").

---

8       This section of the United States Sentencing Guidelines provides that specific offense characteristics shall be determined based on (a) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and (b) in the case of jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as part of the conspiracy), all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity.  The activity may occur during the commission of the offense of conviction, in preparation for the offense, or in the course of attempting to avoid detection or responsibility for the offense.

It is clear that Elliott knew from the Plea Agreement as well as the discussions regarding the statutory penalty that she could be sentenced to the ultimate term of imprisonment imposed by the Court.  She also knew that sentencing would be the result of information not fully known at the time of her guilty plea.  At the time the plea was accepted by the Court, Elliott could only be assured that the sentence of imprisonment ultimately imposed would not exceed the maximum term allowed by the relevant statutory provision.  Elliot has not shown – and has not argued – that there is a reasonable probability that, but for the alleged errors of her counsel, she would not have pleaded guilty and insisted on going to trial.  Thus, she has not alleged or offered any proof of prejudice.  *McAdoo v. Elo*, 365 F.3d 487, 498 (6th Cir. 2004) (quoting *Hill v. Lockhart*, 106 S.Ct. 366 (1985), for the proposition that, "to satisfy the 'prejudice' requirement in a plea agreement context, 'the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial.'").

Elliott has not demonstrated that the loss attributed to her is incorrect; likewise, she cannot show that she was prejudiced by any alleged negligence regarding her counsel's failure to "provide forensic financial loss statements supporting the actual loss" amount.  To meet the objective burden of establishing prejudice, the movant cannot simply allege that she would not have gone to trial if she had gotten better advise, she must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.  *Pilla v. United States*, 668 F.2d 368, 373 (6th Cir. 2012) (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473 (2010)).

Elliott simply cannot meet this burden under the facts presented.  Elliott faced a strong case on the merits, bolstered by the potential testimony of all other co-defendants in the case.

It is clear that the only realistic opportunity Elliott had to reduce her ultimate term of imprisonment was to cooperate early and obtain a reduction for acceptance of responsibility. While the parties did not mention an aggravating role adjustment in the written plea agreement, this possibility was not foreclosed. Elliott fully understood at the time of her plea that the terms were not binding on the Court. In short, the defendant has not shown any objective basis for believing that any error of counsel resulted in a forced plea or a sentence that would not have been imposed regardless of the parties' arguments and representations. And Elliott has not demonstrated that she would not have entered a guilty plea even if her attorney had performed differently. Elliott has not demonstrated cause or prejudice to support any claim of ineffective assistance of counsel.

### B.     The Sentences Received by Co-Defendants

Regarding Elliott's final argument, the Court notes that the defendant did not receive the greatest term of incarceration among defendants sentenced in this case. Similarly, she did not receive the least amount of time in the case. Defendant John Elliott received a sentence of imprisonment of 200 months. Defendant Victoria Conlon received a sentence of imprisonment of 78 months. Defendant Breanne Reilley received a sentence of imprisonment of eight months. Defendant Troy Watts received a sentence of imprisonment of 27 months. Defendant Curtis Jordan received a sentence of imprisonment of 33 months. Defendant Melissa Carter received a sentence of imprisonment of 37 months. Mary Wilder received a sentence of imprisonment of seven months. Defendant Melinda Davidson initially received a sentence of imprisonment of time served; however, based on a subsequent violation of her supervised release, Davidson

-23-

was subsequently re-sentenced to a term of incarceration of ten months. And at this point, Defendant Megan Stone has not been sentenced based on the United States' motion for diversion. [Record Nos. 143, 150, 151]

In the case of each defendant who has been found guilty and has been sentenced, the Court fully considered the defendant's relevant guideline range, evaluated the arguments and statements of the attorneys and defendants, and considered the relevant factors under 18 U.S.C. § 3553. Defendant Elliott cannot point to a single instance where this did not occur. Likewise, she has not identified another similarly-situated defendant who was found to be guilty of similar conduct who received a sentence of imprisonment which was less than the sentence that she received. Elliott's arguments to the contrary ring hollow. She is not entitled to relief under 28 U.S.C. § 2255 based on a false assertion of unequal treatment.

## IV.

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

1.      Defendant/Movant Alysia Elliott's motion to vacate, set aside, or correct the judgment previously entered in Criminal Action No. 2: 11-21-DCR [Record No. 267] is **DENIED**.

2.      Civil Action No. 2: 12-7215-DCR is **DISMISSED**, with prejudice, from the Court's docket.

3.      A separate, final and appealable judgment shall be entered in the habeas action on this date.

-24-

This 15th day of October, 2012.



Signed By:

_**Danny C. Reeves**_   DCR

**United States District Judge**